UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | § | 3:24-CR-00015 | |
| | § | | |
| V. | § | 9:13 A.M. TO 9:26 A.M. | |
| | § | | |
| SAMUEL DAVID SANFORD, | § | | |
| III | § | SEPTEMBER 29, 2025 | |

HEARING ON REVOCATION AND SENTENCING
BEFORE THE HONORABLE JEFFREY VINCENT BROWN
Volume 1 of 1 Volume

*********************************************************

This transcript has been furnished at public expense under the Criminal Justice Act and may be used only as authorized by Court Order.

Unauthorized reproduction will result in an assessment against counsel for the cost of an original and one copy at the official rate.

General Order 94-15, United States District Court, Southern District of Texas.

*********************************************************

**APPEARANCES:**

**FOR THE UNITED STATES OF AMERICA:**
Attorney Kenneth A. Cusick
Office of United States Attorney
601 - 25th Street
Room 227
Galveston, Texas 77550
(713) 567-9000
kenneth.cusick@usdoj.gov

**FOR THE DEFENDANT SAMUEL DAVID SANFORD, III:**
Attorney Natalie Jihad Awad
Federal Public Defender's Office
440 Louisiana
Suite 1350
Houston, Texas 77002
(713) 718-4600
natalie_awad@fd.org

**ALSO IN ATTENDANCE:**
Defendant Samuel David Sanford, III
Probation Officer Ryan McClellan

Court Reporter:
Laura Wells, RPR, RMR, CRR, RDR
601 Rosenberg, Suite 615
Galveston, Texas 77550

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**PROCEEDINGS**

THE COURT:  Good morning.  You may take your seats.  All right.

The first case on the Court's docket is in Cause Number 3:24-CR-15, United States v. Samuel David Sanford, III.

Will the attorneys make their appearances, please.

MR. CUSICK:  Kenneth Cusick for the United States.  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Cusick.

MS. AWAD:  Good morning, Your Honor.  Natalie Awad here on behalf of Mr. Sanford, who is present.

THE COURT:  Great.  And good to see you, too, Ms. Awad.

This is a hearing on a petition for revocation of supervised release.  The petition lists two violations. The first is a violation of location monitoring program, a special condition of supervised release.  The allegation is that the defendant cut off his monitor and threw it in a field off of I-10.

The second violation is failure to participate in a substance abuse treatment program, also a special condition.

How does your client plead to those two violations?

MS. AWAD:  He pleads true, Your Honor.

4

THE COURT:  All right.  Mr. Cusick.

MR. CUSICK:  Yes, Your Honor.  A summary of the facts?

THE COURT:  Right.

MR. CUSICK:  Your Honor, Mr. Sanford was placed on supervised release on February 23rd, 2023.  He had been supervised by Mr. Ryan McClellan, a senior U.S. probation officer in Houston.

Mr. Sanford had been out about four weeks out of custody when he was asked by Mr. McClellan to report for drug testing on July 23, 2025.  Mr. Sanford sent a message confirming that -- that appointment was made on July 17th for July 23rd.

On the 23rd, Mr. Sanford did not appear.  And then it was found out through the electronic monitoring company and Mr. McClellan found out the ankle bracelet was cut off and located in a field adjacent to Interstate 10.

That would be the government's proof, Your Honor.

THE COURT:  In light of the defendant's plea of true to both violations and the offer of facts by the government, the Court finds both of those violations to be true.  The Court has reviewed the revocation worksheets and Chapter Seven policy statements.

The statutory maximum term of imprisonment in this case is two years.  According to Chapter Seven

*Laura Wells, RPR, RMR, CRR, RDR*

computations, the imprisonment range for a criminal history category of six and a Grade C violation is 8 to 14 months.

In addition to reviewing all of that, I have also read letters submitted to the Court from the defendant himself, from Katie Rohraff, Nicholas Unger, Frank Buzbee, and the defendant's wife Elizabeth Sanford. I'm getting tongue-tied this morning.

All right. Mr. Cusick, the government's position on revocation.

MR. CUSICK: Your Honor, the government recommends that the supervised release be revoked and that Mr. Sanford be sentenced to 24 months in the Bureau of Prisons. The reasoning going above the guidelines of 8 to 14 is taking into account the fact that he is going to get credit for one and a half to two months of custody already, if he behaves, and good-time credit he will get and other credits.

It's the estimation of the probation department and the United States attorney's office that he will -- if he gets 24 months, he may only end up doing 15 or 16 months. Likewise, with the top of the guidelines it may be that he is looking at something less than ten months.

So based on the conduct in the case, the fact that he had been on supervision, there had been a revocation

before, and the -- just the timing of he gets out of custody and in short order, in a few weeks, cuts the bracelet off and completely rejects supervision, the government feels that 24 months is appropriate.

THE COURT:  All right.

And from the defense.

MS. AWAD:  Yes, Your Honor.  Due to the fact that these violations are Grade C violations, revocation is not mandatory in this case.  But if Your Honor were to revoke Mr. Sanford's -- revoke Mr. Sanford's supervised release, we would request a sentence at the bottom of the guidelines.

Your Honor, as Mr. Sanford described in his letter, obviously what he was going through when he removed his ankle monitor was the result of a mental health crisis. He has expressed to me his desire to attend mental health treatment, and he told me that he was not afforded the opportunity to do that.  And I do think that would be an additional condition that would greatly benefit him.

And, Your Honor, he described to me that he -- when he was arrested for his pending case that his commercial driver's license was revoked.  So because of that, he was not able to work.

And he has a wife who had just had an emergency C-section.  And so there were a lot of pressures on him.

So because of that he just -- he had a mental health crisis.  So I do think 24 months is far too excessive for two Grade C violations, and it also does not take into account that he has accepted responsibility for those two violations.  And he obviously has the support of the people who wrote the letters, and his support is in the courtroom today.

So based upon that, I do believe that a sentence at the low end of the guidelines would be appropriate for this, for this case.

THE COURT:  Okay.  Two of these letters are from people who say they have work for him.  So I don't understand why he couldn't work if he didn't have a CDL if he has got these other people saying they have got good work for him to do.

It's not just a C violation when he cuts his monitor off and throws it into a field and then runs to Louisiana.  That's not just a mere little C violation.

And all of this comes after on June 3rd we had a revocation hearing, and I told him it was his last chance.  And then on July 23rd is when this happens, a month and 20 days later.

Mr. Sanford, do you have anything you want to say to the Court before I rule?

THE DEFENDANT:  Yes, sir.  Good morning.  I have

been dreading this appearance because I -- first off, I do want to thank you for giving me the opportunity that allowed me to go out there and meet my daughter.

And I got out there, and I was completely overwhelmed with my mental health. I have PTSD that I suffer from being in the United States penitentiaries and going through that for over a decade of my life and pretty much living in a war zone. And it's messed my head up. And it has given me extreme paranoia, extreme panic attacks, and I suffer from PTSD.

And I was completely overwhelmed by the situation. I had a wife that had just had to have an emergency C-section. I had an infant. I was enclosed in a trailer. I mean, the odds just -- everything just seemed so insurmountable to me.

I was having a hard time with work and, as you pointed out, there are people out there that have stepped up now and that have said that if I was able to get back out that they would be able to provide me with work and transportation to work.

At the time I completely -- I had a mental health crisis. I had a panic attack and it seemed like it was inevitable that I was going to get locked up and I made a terrible decision and I cut my monitor off. And in my way of thinking at that time, it was that I would be able to

get somewhere and set up something to where I could work under the table where I wouldn't have to be separated from my wife and my daughter, which are the most important thing to me in this world.  And I just didn't see any other way.

In retrospect, in looking back, I mean, I definitely see the errors of my ways and that that was not the right choice to make.

But do I think that getting sent back to prison for two years is the answer to this?  No.  I mean, a lot of my mental health issues derive from being incarcerated in prison and dealing with those; and I have never really been afforded an opportunity to address the roots of my problem which are, you know, mental health.  And then untreated mental health turning into substance abuse.  I have never had an opportunity to really address the root cause of the things that I do.  And I'm not trying to justify anything that I did, Your Honor.

And I really feel like that I've let you down and I did and I thought about you quite often as I was going through this.  And as I was going through this mental health crisis, I thought about you sitting there on that bench and giving me the opportunity, because I appealed to you as a father, and allowing me to go out there and meet my daughter.  And I will -- no matter what happens today,

I will forever be grateful for that because I did -- it was more than I could imagine; and as you know, she melted my heart right off the bat and I love that little girl so much.  And she is doing well.

And what I long for is to be able to get the best version of me back out there to her.  And do I think going and sitting in the penitentiary for two years is going to bring the best version out of me and get me back to her to be the productive father and the husband that I'm supposed to be?  I really don't.  I don't.

I would like to be able to address my problems and the roots of it.  I mean, I'm not trying to have a pity party here; but I have been through pretty rough things going through the life that I have lived, the substance abuse that I have done, and the mental health issues that I have had.

Even still today, as I was arrested on August 21st, I have been trying to receive mental health treatment since I have been incarcerated; and I have yet to see anyone who will help me get medicated.

I finally did see a psychologist over at Joe Corley and she told me she was going to schedule me to see the doctor last week and I never saw the doctor.  And it's been a -- it's been a task.  And when I got out, we all agreed that it was paramount that I receive mental health

treatment; and I never received a referral from the probation to go get the mental health evaluation and the medication.

And it was almost two months later and I did get the referral to go to the substance abuse treatment, you know, and it was -- I am already having a panic attack.  It was in the middle of Fifth Ward, Texas.  And, you know, I felt a little bit out of place and intimidated by the place that I was sent to over there.  I really did.

And I'm not -- and again, Your Honor, I'm not trying to justify my actions because -- in retrospect, I would say that there are a million other different ways that I could have went about this to try to resolve this situation without taking flight.  But my fight or flight kicked in; and I decided to run, which I know was a terrible mistake.

But I think two years in the penitentiary, do I think that's going to make me a better father and get me back to my daughter to give her the father that she needs?  Personally, I don't.

But I do put myself at the mercy of the Court, and I now respect your judgment because I respect what you did for me in allowing me to go out there and meet my daughter, which is beautiful.  And I appreciate that more than you'll ever know.  And I do thank you for that, sir.

*Laura Wells, RPR, RMR, CRR, RDR*

I put myself at the mercy of the Court.

THE COURT:  All right.  I'm glad you got to meet your daughter.  Most of what you just said are things I took into account on June 3rd when I didn't revoke your supervised release.  And this isn't me sending you to the penitentiary.  This is a choice that you made.

Having considered the Chapter 7 policy statements, the Court revokes the defendant's term of supervised release and sentences him to 18 months.  The revocation sentence is imposed pursuant to Chapter 7 policy statements and is in accordance with 18 United States Code, Section 3553.

Following his term of imprisonment, the defendant will no longer be on supervised release.

Additionally, the Court orders payment of the remaining unpaid restitution, which was imposed in connection with Mr. Sanford's original sentence.  The amount remaining in restitution is $17,283.06.

The defendant is advised that he has the right to appeal this judgment pursuant to Rule 32(j)(1)(B) of the Federal Rules of Criminal Procedure.

Is there any request that I can make to the Bureau of Prisons?

MS. AWAD:  No, not at this time, Your Honor.

THE COURT:  All right.  If you'll let George know if you have one.

*Laura Wells, RPR, RMR, CRR, RDR*

MS. AWAD:  Yes, Your Honor.

THE COURT:  All right.  Go do this time and come out and take care of your family.

The defendant is remanded to the custody of the marshal, and the Court stands in recess.

CASE MANAGER:  All rise.

*(Proceedings concluded at 9:26 a.m.)*

*Date:  November 5, 2025*

### COURT REPORTER'S CERTIFICATE

*I, Laura Wells, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

*_____/s/ Laura Wells_____*

*Laura Wells, CRR, RMR*